If this court does not enjoin the challenge provisions of House Bill 589, North Carolinians who should be able to vote in the November elections will be prevented from doing so. And that disenfranchisement can be prevented by simply having election administrators administer elections the way they have for years. This circuit reviews the decision to grant or deny a preliminary injunction for abuse of discretion, and abuse of discretion is present if the court below misapprehended the law on the underlying issues in litigation. The district court made critical legal errors that require this court's intervention. The severe irreparable harm that flows from an injury to the right to vote, when weighed against the meritless justifications offered by the state, demands an injunction. Are you focusing on the 14th Amendment aspect of this case, the constitutional aspect of it? Yes, Your Honor. The verdict claims, race-neutral claims. Without same-day registration and out-of-precinct provisional voting, tens of thousands of voters will be unable to vote and will have no steps they can take to ameliorate their situation. Under the pre-House Bill 589 system, a voter who showed up to early voting to find there was a problem with his registration, be it from a clerical error, a purging, etc., could take steps to rectify the situation and vote a regular ballot. The Brennan-Amicus brief at page 6 shares a report that was recently issued describing a veteran returned from 18-months tour of duty in Afghanistan, went to early vote, found his registration was not on the record. Ms. Riggs, if we should find that the burden here is not severe, what do we do? The Fourth Circuit has been clear in McLaughlin. In footnote 6, the McLaughlin court said, even if the burden is not severe, a rational regulation can still be invalidated when the state's interests that are served are minor. And here, with a proper application of the verdict balancing test, I think the court can't help but conclude that the burdens are much more than minor, are in fact severe and significant. And what does Crawford do about it? Certainly. Crawford, the record in Crawford was quite different than the record in front of the district court here. But what saved the voter ID provision... Crawford is what makes Anderson verdict applicable here in this context, correct? I think that Anderson verdict has been applicable since before Crawford, it's the most recent application. The first time the Supreme Court had said that analysis is applicable in this kind of case, isn't that right? Certainly. And they applied to that analysis and Justice Stevens in the plurality controlling opinion noted that what saved the voter ID requirement in Indiana was the fact that voters had a way to rectify their situation. And he specifically examined the situation where a voter goes on election day, does not have an ID. What saved it for Justice Stevens was that the voter could then go back, sign an affidavit of saying he couldn't afford or couldn't get an ID and his vote could be counted. That is dramatically distinguished from the situation we have in front of us here. If a voter goes during early voting and there's a problem, there is nothing he can do to ameliorate. If a voter shows up at the wrong precinct at 7.15 p.m. on election day, there is nothing that voter can do under House Bill 589 to ameliorate. So you would distinguish it from the Supreme Court case on the amount of burden that the state has? Is that the basis for your distinction? It's distinguished both on the burden and the justification. That's right. I get that. More correctly, you would say that there isn't as much justification here. Absolutely. And the case that we handed up from the Sixth Circuit that came down yesterday, the state in Ohio for a cut to early voting and a repeal of their equivalent of same-day registration were the exact same justifications proffered in this case, and the district court in the Sixth Circuit found those did not outweigh the burdens on voters. And the burdens on voters in North Carolina... They've already petitioned for a re-hearing on that. Certainly. But that's the law as it is now. And the burdens in North Carolina are demonstrably larger. For example, in 2010, perhaps the most comparable election, over 200,000 voters voted during the eliminated days of early voting, over 21,000 voters either corrected or newly registered using same-day registration, and 6,000 voters had their ballots counted because of out-of-precinct provisional balloting. How do those statistics compare with the primary here that was held under the new system? In the primary, recently, there were a million votes cast. In November, we can expect roughly three times as many. I know. How does the primary under the new system compare to a primary under the repeal system? Well, I mean, comparing... In the statistics that you were talking about. Certainly. Comparing 2010 to 2014, different elections, different kinds of races, there were... You raised the comparison. Certainly, Your Honor. Turnout is not the determinative issue under Anderson-Burdick. For example, the Sixth Circuit explicitly said that yesterday, that the... Well, for better or for worse, you're in the fourth, right? Yes. Absolutely, Your Honor. And still, that doesn't end the inquiry because voters are and were disenfranchised under this new law. Gloria Hill from the Hope County Board of Elections testified that during the primary, she saw 40 voters leave early voting while she was watching because they were not registered. During the most recent primary. During the most recent primary. And yet, no one asked for a preliminary injunction before the primary did that. The scheduling order that we were put on with Judge Peek was entered in December and didn't really... There wasn't really the possibility for that to happen under that schedule. The... We asked for it for, what, two weeks after the primary. The primary is held on the 6th and you get removed for preliminary injunction on the 19th. And that deadline...  No, certainly not, Your Honor. I'm not familiar with any scheduling order after that. Certainly not, Your Honor. There was a deadline for the filing of preliminary injunctions and there was a substantial amount of discovery that needed to be done. The elections in November, again, anticipated three to four times the volume. And this doesn't... If we hadn't had a primary and hadn't had any stories to tell, we might have been in an even harder situation than we find ourselves today. But the reality is, is that under the proper application... You haven't directly answered my question. I'm just going to really continue to press it. I know you have other things to say. But can I take from this that you cannot make the same kind of case when you compare the primary under the new system as you could under the old system? The kind of statistical case you've been making in your papers with respect to the different elections. Well, same day... I think the answer is no. There was a same-day registration, so I can't tell you how many people would have used it. Likewise, out-of-precinct provisional ballots weren't counted. It's not in the record. It's in the report in the Brennan Center Brief, but we're looking at in the hundreds of out-of-precinct provisional ballots cast and not counted. But election administrators were telling people, your ballots won't be counted. So why would you cast a provisional ballot? Why bother if you knew it wouldn't be counted, whereas it was under the prior law? Does it matter that the type of election, the primary election is markedly different than the general election, in that the percentage of voters voting in a particular primary may be somewhat different, certainly is always lower than the general election. Does it matter? And is that a fair comparison under the facts here, where the previous system had been in place for so very long, you then have a primary in which, I take it primarily a partisan type of election, for the most part, in which the concerns that were raised there are not nearly what they are in the general election. Absolutely. The numbers and the makeup of the electorate make that comparison a little bit different. There's ample evidence in the record on why primary elections tend to be the most excited, most partisan, most eager voters, least likely to be affected by these decisions. And does it matter? Are you saying there are more voters in the primary than in the general? No. Fewer... I'm sorry, but... You said there are more excited and more interested, and I thought that meant there'd be more. No. There are more excited and more interested, fewer number, but less likely to be stymied by the extra burden. Before I move on, I'm sorry if I didn't finish my answer, but there is a difference. The Sixth Circuit also addressed the fact that yesterday, that every election provides some sort of information. So even the presidential election is informative. And the numbers that I've been citing are all from the 2010 primary. They're even more stunning when you talk about a presidential election. The state argues that if we grew with you on one or more provisions, that it would create a terrible burden on them to get ready for this election. What do you say to that? The state is absolutely wrong, Your Honor. And I would like to discuss the balance of equities here. With reinstating the counting of out-of-precinct provisional voting, it would take zero lead time for the state to reinstate that. All they have to do is instruct election officials to count provisional ballots after the election. With regard to same-day registration, same-day registration is enabled by an... Early voting presents a totally different situation, doesn't it? I mean, you'd have to extend it seven days. You'd have to then reconfigure the way in which voting occurs during that additional seven days, which is not very long from now. That's a different situation, isn't it? Respectfully, Your Honor, it's a little different, but the structure for early voting still exists. If the injunction was entered, all that would change would be that early voting would be offered at the county boards of elections starting seven days earlier. Counties that have already finished their plans can leave them as is, and the provision North Carolina General Statute 163-227.2 just allows for the county boards to be open during weekdays starting seven days, which, if you enjoined it, would be seven days sooner. And, in fact, 85 counties in November have an early voting site as their county board of elections office or in the same building. Does it matter that even though the days that you seek could lengthen the time period, that nonetheless the number of opportunities in terms of hours is virtually similar? In other words, the opportunity to vote, still the hours that actually a person has to vote are pretty similar, even though the days aren't as long? Two reasons why that doesn't completely solve the situation, Your Honor. First is that election hours aren't fungible. People like to vote at lunch, and this is in the record, people like to vote at lunch and right after work. So adding an extra hour in the morning or an extra hour in the evening doesn't change the fact that you've taken away days, opportunities for voters to go. Additionally, the undisputed evidence in the record is that voters become habituated to early voting. They learn the rules, they rely upon them, and in Florida in 2012, academic studies discussed in the record noted that on the eliminated Sunday before the election day, the final before voting day, 18 percent of voters who had voted on that eliminated Sunday in 2008 didn't go back and vote in 2012. They tracked them by number. So there is a demonstrable falloff, people who cannot adjust. Going back very quickly to reinstating same-day registration, I'd point Your Honors to the deposition testimony of Mark Burris, who's the IT director for the State Board of Elections at JA 580-81. He describes this online application that's been run before, has been tested before, just needs to be put back up online as part of SEAMS, and the problem is solved. This is not a huge administrative burden on the state. Well, there was testimony in the record to the contrary about the burden that the state has. You would agree with that? I think there was testimony in reply to the motion to expedite. The testimony of Director Strack at the time of the hearing was that she would implement what the court ordered her to do. What about Sherry Boucher? Sherry Poucher? Poucher. I'm sorry. I apologize. She's a very nice lady. Her testimony, what I don't believe, was that she couldn't get it done. Every election administration... She outlined a substantial amount of burden. I mean, she may be wrong, but it's in the record, right? There will always be some administrative burden on the state in administering elections. That's just the reality. It's being weighed against the fundamental right to vote and the fact that if you look at both the character and the nature of the burden on the right to vote here in North Carolina, it's substantial. The district court erred by applying a binary, rational basis, or strict scrutiny. They did not apply the heightened scrutiny required under the law, and that was a critical legal error that led them to the wrong conclusion. We otherwise proved all of the points we needed to for an injunction. I see I am out of time now. I appreciate your observing the time, the generous time period we've given you, and I hope that your fellow counsel are going to follow suit. Absolutely. Thank you very much. Thank you. Thank you. May it please the court. I am Penda Hare, and I will address Appellant Section 2 claims, and I request to reserve five minutes for rebuttal. In Shelby County v. Holder, the Supreme Court described Section 2 as a nationwide ban on discrimination in voting. Section 2 prohibits voting practices that result in denial or abridgment of the right to vote, and the test is whether the challenged practice results in a political process that's not equally open to minority voters. And as the Supreme Court held… What does that mean? I don't want to be determined. Yes, Your Honor. The Supreme Court in the Jingles case, I think, gives us a guidepost. The court there said that the essence of a Section 2 claim is that a challenged law interacts with social and historical conditions to result in an inequality in opportunities enjoyed by white and minority voters to participate in the political process. And the Senate report on the 1982 amendment to Section 2, which gave us this results test, makes it very clear, and the Jingles case makes very clear, that this is a broad law intended not just to prevent discrimination that actually occurs in the voting process, but to prevent social and economic disadvantages that are caused by a history of racial discrimination from being imported into the voting process. So we believe that the district court below made several legal errors in analyzing Section 2, and that when those legal errors are corrected, that it is clear that we did establish a likelihood of success on the claims that we made below. And I'd like to walk through the legal errors that the district court made. First, on same-day registration and out-of-precinct voting, and then on early voting. And in this case, the findings that were made by the district court, we believe, actually support and compel a conclusion that Section 2 is violated. The district court made the finding that African Americans use same-day registration and out-of-precinct voting at roughly twice the rate of whites. And the court also found that repealing these practices would, quote, bear more heavily on African Americans. And that's one part of the Jingles test, that is the adverse impact. And then the second part of the Jingles test is the cause of the adverse impact. And again, the district court made findings that African Americans in this state suffer from severe social and economic disadvantages, and that those disadvantages directly impact their ability to vote. Lack of transportation, 34% of the African Americans in the state live below the poverty line in terms of income. They have less flexible job schedules. The district court seemed to think that because there were alternatives for everyone to vote, that this was all all right. And so how do you meet that argument? Yes, Your Honor. Alternative ways. Yes. So the district court, we believe, failed to recognize that Section 2 prohibits not just an absolute bar to voting, but a burden on voting that is unequal. So when the district court pointed to the other ways of voting, which are made available under the Federal National Voter Registration Act, those ways of voting have been required by Congress since 1995 and implemented in the state of North Carolina. But what the record shows is that when African American registration started really increasing was when same-day registration was brought into effect in 2007. And the district court, there's no evidence in the record that these other methods of registration actually work for African Americans. All the district court did was just cite to the federal law. And yes, those alternatives are available, but what we know... Well, in the matter of policy, who decides how elections should be conducted? Does the voter decide, or does the state decide? Well, Your Honor, the state... The state decides unless it decides unconstitutionally or illegally. In violation of the Voting Rights Act. That's correct. So if it's just a matter of preference, you would lose? Yes, Your Honor. We believe that the district court committed legal error when it described the burden of repeal of these provisions as a mere preference. And we believe that that is true because the district court made the finding that the social and economic conditions and disadvantages of African Americans in the state, which the district court also found stem from racial discrimination. Those social and economic disadvantages make it harder for African Americans to vote absent these provisions. That was the difference with the district court's decision in your announcement on how you think the law is in terms of past practices. The district court felt those were not recognizable, at least recognizable under the Section 2. Because Section 5 had essentially been done away with. Well, I believe that that is another legal error that the district court made. The district court, in our view, went to the brink of making a correct application of Section 2 in the fact finding. And then the district court stepped back and said, well, there are these other factors that I'm going to take into account that are going to cause me to rule against the likelihood of success. And one of the other factors is the district court said there would be improper importation of the retrogression standard. And I just want to be clear that plaintiffs' appellants have never sought the retrogression standard, which measures how African Americans are treated against each other under the current plan versus how African Americans were treated under the prior plan. Our contention is that African Americans with the repeal of these provisions are going to be treated unequally as compared to whites. And that's the Section 2 standard. And we believe, though, that the evidence of how African Americans use same-day registration and out-of-precinct voting is relevant. And the Sixth Circuit yesterday explained that very clearly, that the evidence is relevant in addressing the ultimate Section 2 question, which is how African Americans will fare compared to whites under this new system. What type of injunction do you want? Preservatory or mandatory? Does it make a difference? We are seeking to preserve the status quo as it existed in the last uncontested state of affairs between the two parties, and that, we believe, is a prohibitory injunction. Let me just turn very briefly to another error that the district court made, and that is in its analysis of the tenuousness or non-tenuousness of the state's interest in this law. And I want to start with out-of-precinct voting, because the district court found, again, disparate impact connected to social and economic conditions that caused African Americans to use and need out-of-precinct voting more than whites. And that, to me, is a classic Section 2 violation for the Jingles case. But the court then said, I'm not going to find a Section 2 violation because so few voters use these ballots that the impact is minimal. And we believe that that is legal error because the test under the Voting Rights Act is not whether the number of voters that are impacted, but whether there is equality. And the district court's own findings make clear that African Americans use out-of-precinct ballots more often than whites because, as Ms. Riggs said, you can be at the precinct at 7.15 in the evening, you're at the wrong place, and you have no transportation to get to the correct precinct. And under the new system, your ballot just won't be counted, whereas the state has previously counted those ballots with no problem and the state, the legislature... The state maintains that they have dismantled all of their prior paraphernalia and they have new instructions and so forth. Well, Your Honor... They train people differently. They have to retrain them. They send out information to every voter in the state. Has that information already gone out? Well, there has been information that has gone out, but with respect to out-of-precinct ballots, the state has to offer provisional ballots in any event. Federal law requires that. Have you been following the Wisconsin case? Yes, Your Honor. And apparently things are in mass confusion now in Wisconsin. Nobody knows. Voters don't know what they're supposed to be doing. I assume you wouldn't want that happening in North Carolina. No, but Your Honor, we do not believe that if this court were to enter an injunction in this case, that it would lead to that kind of mass confusion because the voters in this state have been using these methods and we're just asking that the court allow the voters to vote this year the way that they voted in 2012 and 2010. And I see that my slide is on. Thank you. Your Honor, may it please the court, my name is Mark Elias and I represent the Duke Appellants, which are a group of North Carolina voters that intervened in the League of Women Voters case below. We have brought two challenges, one under the 26th Amendment and also a 14th Amendment challenge akin to the Burdick challenge that you heard argument on before. This has been a curious proceeding for the 26th Amendment claim because despite several rounds of briefing and a lengthy hearing, the state has never contested our likelihood of success in the matter. Not once. They had an opportunity to address our arguments in response to the motion for a preliminary injunction and they failed to do so. They had an opportunity to address our arguments in their motion to dismiss under 12C and they failed to do so. They had an opportunity to address our arguments in response to our motion for an injunction and an appeal with this court and they failed to do so. Well, you do have a rather novel argument here, don't you? Your Honor, I don't believe it is a novel argument. It is an argument grounded in the plain text of the U.S. Constitution. The 26th Amendment states the right of citizens of the United States who are 18 years of age or older to vote shall not be denied or abridged by the United States or by any state on account of age. That language mirrors identically with the exception, obviously, on account of age. The 15th Amendment and the 19th Amendment. The legislative history in the passage of that amendment could not have been plainer. They intended to make the 26th Amendment coextensive with the 15th Amendment. Well, didn't the district court say that you had made a clear showing of your reparable harm? Your Honor, that's a very important point. Yeah, I think that is very important. Because, Your Honor, it is the only... You're representing 16 and 17-year-olds, right? No, Your Honor, I represent 18, 19, 20, and 21-year-olds. And those 18, 19, 20, and 21-year-olds are denied? Excuse me? They're the class that's been denied this right? Correct, Your Honor. These are voters. These are not non-voters. These are voters. So these are people who are eligible to vote. They have a constitutional right to vote. They have a statutory right to vote. They are not 16 and 17-year-olds. How do they come under the amendment? How do 18, 19, and 21-year-olds come? The purpose of the amendment, Your Honor, was to... Well, for example, somebody 50 years old, according to you, would also be representing them, right? Absolutely. Everybody in the world you're representing. I think we were talking about particular relief with respect to the 16 and 17-year-olds. You would disagree with that? Your Honor, the relief we're seeking is not for 16 and 17-year-olds. I think the confusion is that we pointed to the pre-registration, the repeal of pre-registration of 16 and 17-year-olds as an indicia under Arlington Heights of what the legislature had in mind, right? Because legislatures don't come out and say, let us discriminate against 18-year-olds, 19-year-olds, 20-year-olds because we don't want them voting in our elections. The fact is we have the 26th Amendment because lots of states didn't want 18, 19, 20-year-olds, and 21-year-olds voting in their elections. And Congress passed a constitutional amendment which was ratified by the states to tell states they can't deny or abridge, they can't abridge the right of vote of that class. Just as they can't do it based on race, they can't do it on account of age. How different is that from the 14th Amendment claims? I mean, it would seem, and I'm sort of perplexed because I thought, like Judge Motz, primarily you were focusing on the ones before 18 for the 26th Amendment claims, but you also make a 14th Amendment claim and you bring in everything else and tie them in in terms of how it fits with them. I can see how to expand the class. How old? Are you saying there's a... And maybe you can help us with that because you just said it also would apply to 50-year-olds. A claim could be brought on behalf of 50-year-olds. Our claim in a nutshell is this, is that North Carolina looked at its voting laws and it was motivated in part to change those laws to make it harder for young people to vote. 18-year-olds, 19-year-olds, 20-year-olds, 21-year-olds, 22-year-olds. Made it harder for them to vote because the North Carolina legislature didn't want them voting in their election. So how did they do that? Well, one thing they did is they made it harder when you're 16 and 17 to get on the rolls to then vote when you're 18, and that's the preregistration provision. Not because I represent 16 and 17-year-olds, but rather it's an addition of the hostility that the legislature had towards the 18- to 22-year-olds. What else did they do at the same time? Interestingly, when they passed an ID law, they said, well, we're going to let all, we're going to let state IDs, driver's license, tribal IDs, but not University of North Carolina IDs. Now think about that for a second. What interest would the state have in saying, hmm, we want state-issued IDs except for the ones issued by our own university? And of course, it would not be on the ID law today because that won't go into effect until you're on the rollout of it. Correct your honor. We're here for the reason why I mentioned the ID is the same reason for mentioning preregistration. It's a window into what the legislature was trying to do when it repealed same-day registration. That all may be true, but the finding was that there was no reparable injury right now. And there is a reparable injury. The trial court simply got it wrong. If you look at the affidavit of Lewis Duke, Mr. Duke said that in 2012 he moved to Campbell University campus in the fall of 2012, submitted a new registration form updating his residence to an on-campus address. He believed he had been registered. He showed up and attempted to utilize early voting in the 2012 election and was told that he was not registered. Had there not been same-day registration, he would not have been able to vote. Mr. Duke and several of the other plaintiffs have also said that they would utilize same-day registration and they would utilize early voting if they were permitted to. The expert report that we submitted, which is uncontested... All we have are your interviews. We don't have a class, right? Correct. Your Honor, in Shaw v. Reno, you didn't have a class. You had five voters. In McCutcheon, just before the Supreme Court, you didn't have a class. You had one donor. Citizens United, you had one corporation. In Heller, you had one person who wanted to own a gun. What do these declarations tell us about the irreparable injury that the intervener is going to suffer after an injunction? My clients have a right not to be discriminated against and have voting laws changed to make it harder for them to vote based on their age. How does same-day registration happen? Aren't they already registered? Your Honor, if you look at the record and the expert report that we submitted, you will see that young voters disproportionately use early voting, disproportionately use same-day registration, disproportionately use out-of-precinct voting compared to other age cohorts. So if you were a legislature that wanted to discriminate against young voters, what you would do is repeal those things because like African Americans, young voters, far in excess of their proportion of the population, make use of those voting methods. And what's important, Your Honor, though, is that this is in the record, and the state hasn't contested it, and the trial court didn't find it. And I think it's because they know that they discriminated against young voters. Their position is it didn't matter, not that they didn't do it. And so my position, what I'm here to... Well, I think your position is that no harm, no foul. What harm? Where is your irreparable injury for those three pieces? My irreparable injury, Your Honor, if we were talking about race and not age, if you believe that the 15th Amendment and the 26th Amendment are code steps, then your question would be... Are they registered now? They are, but they wish, but they, well, they believe they are, but they believe they were before. They wish to take advantage... Have they offered any evidence that they're not? Your Honor, they believe they're registered. They would like to early vote, in the same terms that anyone else should have the right to early vote. Okay, so you make the same claims about early voting, okay. Absolutely. But I don't see the fact that they are young necessarily assist you with that. It is what it is. I think what assists me, what assists me is that the state of North Carolina has been intentionally discriminated against this class in a way in which if I had... But it's not a class. I'm not representing a class. I'm representing individuals who fall within a class in the same way that I might represent an African-American voter individually who has been told that they have to take a literacy test. Of course, the trial of this is not here today, and this is not what's before us. Ultimately, this all will come up in the trial. What we are limited here today is to deal with Going back to Judge Box's question, when you deal with, as you said, you have Innovena clients here and you're not representing a class, the question is what irreparable harm is going to happen to your clients if we don't enjoin this from their perspective? My clients won't be able to early vote seven days further out than they otherwise would be allowed to. If they are forced to... Your time is expired. You can go into rebuttal. No, Your Honor, I'll save rebuttal for rebuttal. Thank you very much. Ms. Thomas? May it please the Court, Holly Thomas for the United States. In the view of the United States... Ms. Thomas, has the United States filed a Notice of Appeal? No, we did not file a Notice of Appeal. Why does your brief call you out? I believe we've freshened up the Statement of Views of the United States. Yeah, no, you did file your Statement of Views, but you're characterized on the brief as appellant, but you're not, right? No, we are not appellants in this case, Your Honor. Does the United States believe that we should... What relief does the United States seek? The relief the United States asks for is a remand to the District Court for the application of proper standards to evaluate the Section 2 claims. So the United States doesn't think that we should enter any injunction ourselves prior to the election? We do not object to the plaintiff's request for this Court to enter that injunction. I didn't ask that question. I'm asking what the United States thinks we should do here. We felt that it was appropriate for the District Court to have an opportunity to properly apply the legal standards. However, the District Court really got almost all the way there in its analysis. The District Court found that this HB 589 would have a disproportionate impact upon minority voters. If we remand, almost by definition, there won't be enough time for there to be the change that the plaintiffs wish. So is the United States ready to forego that relief in this election? Not at all, Your Honor. Well, then why didn't the United States appeal and ask for that relief? The United States was considering whether to appeal at the time that this Court issued its invitation for us to file a statement of view. Rather than prolong the appellate process, we decided that it made sense to go ahead and file a brief in response to this Court's invitation. We wanted to hear your argument, but you don't even in that brief tell us whether you agree with the relief that the appellants seek here. And that's what I'm trying to get at. And, of course, you could file your Notice of Appeal at any time. We did not want to delay the appellate process. You wouldn't have delayed anything. We've already accepted it. By filing our Notice of Appeal. But, no, we certainly do not object to this Court immediately entering an order. We believe that there's time for the District Court to go ahead and do the correct thing, because the District Court already has all the findings that it needs to enter an order, entering a preliminary injunction in this case. Does Section 2 have a balancing requirement? If so, what's the source of that requirement? Section 2 has a totality of circumstances analysis. It's not a balancing requirement, such as applies to the constitutional claims in this case. That totality of the circumstances analysis looks at the past and present history of the political situation in North Carolina, looks at the history of discrimination, looks at present socioeconomic circumstances of minority voters, and determines whether or not those voters will have less opportunity under the current law. And we believe that the District Court erred in making that analysis by discounting the importance of the history of the changes that North Carolina had made to its voting system over the course of the 2000s. What that history demonstrates is that there is a system under which minorities are more equal, and that's what Section 2 is aiming at, is equalizing the opportunities for minority voters. Is your Section 2 analysis different from a retrogression analysis? It is different from a retrogression analysis. Yeah, so the Supreme Court has made very clear that the history of a state matters in making the Section 2 analysis. In Reno v. Bossier Parish, the court said that it makes no sense to talk about the right to vote being abridged without something to compare it to. So what we're looking at here is not a comparison from the rights of minorities to vote today versus the rights of minorities under the prior system. It's looking at whether minorities have an equal opportunity to white voters. And that's what the prior system helps us see, is that under that system, minority registration and turnout, both went up. In fact, the rates exceeded the rates for white voters in the 2012 election. So we know that if we go back to the system that existed prior to those changes in the 2000s, what the circumstances will look like, and that minorities will, again, be less equal. So while Section 5 is talking about backsliding, what Section 2 is talking about is combating discrimination more generally compared to minority voters to white voters. It seems to me you do a pretty good job on that, but I'm left with thinking, okay, the state did something good for minorities, and now it's being penalized. We don't believe that the state is being penalized for doing something good. Our argument is not that a state can never make a voting change and then go back on that change. What we're saying is that if you look at the changes that were made in 2001, 2005, 2007, you can see that that equalized opportunities or helped to equalize opportunities for minorities to vote. So you know that if you... So every time they make a change to help, they can't harm people, is that it? It's not... I'm just trying to tease out just what we do do. Yes, Your Honor, it's not the fact of the change in the United States view that matters. What the change gives you is a comparison. It gives you that comparison that Bossier Parish is asking for and allows you to see that, yes, this is a system under which minorities are more equal. But you could have a Section 2 violation in a state that had never done anything. Right, but you do not have a Section 2 violation in a state that has had a more favorable provision for minorities. Absolutely. And what would be the basis for that then? What would be the rationale? You would make the totality of circumstances analysis in every case. So if you had a state where you didn't have factors such as the history of discrimination in voting, where you didn't have a history of discrimination that had led to present socioeconomic burdens that fell more heavily upon minorities, then when you made that totality of circumstances analysis, you might not find that, for instance, cutting back on the number of days of early voting led to a Section 2 violation. You would really look at it case by case. And that's another error the district court made here, in that assuming that finding a violation in North Carolina would mean that every other state could be liable. But that's just not so. The analysis is intensely local, as the court said, in jingles. It's really looking at the specific jurisdiction. The final error, and I know my time's almost up, was that the court failed to look at the cumulative effect of this law. We believe that cutting back on early voting, eliminating same-day registration, and out-of-precinct balloting will have combined, have a very heavy burden upon a minority voter in any election in North Carolina. If this court has no further questions, I'll rest on my feet. Thank you very much. Thank you very much. All right. Thank you, Your Honor. May it please the court, I'm Alec Peters of the North Carolina Attorney General's Office, representing the state of North Carolina and the State Board of Elections defendants in these three cases. With me at council table is Tom Farr and Phil Strack, who also represent those defendants with me, and Butch Bowers and Bob Stevens, who represent the governor. I will, with the court's permission, take up to 30 minutes to address the standard of review and to address what we've really heard very little about in this appeal, and that is the judge's findings, the district court judge's findings, on likelihood of suffering irreparable harm. And Mr. Farr will take the remainder of the time to discuss the Section 2 and 14th Amendment arguments, 26th Amendment arguments, likelihood of success on the merits. Is someone going to discuss the alleged burden on the state? Yes, Your Honor, I have worked into the irreparable harm, and I can start there because I think it's important, very important to remember when the court considers this case. The standard of review is a high one to begin with. It's an abuse of discretion standard, at least to the district court's findings and facts, and those are not to be disturbed unless there is clear error. The Supreme Court, in the Persil case in 2006, noted that there is a particularly high hurdle that needs to be considered when election laws are at issue because the closer we get to an election, the more likelihood there is that changing the rules can cause voter confusion, and the Supreme Court went so far as to say, in that case, as you'll recall, the district court had denied a preliminary injunction. The Ninth Circuit entered a preliminary injunction, and the Supreme Court said doing that can actually contribute to voter confusion. What we have in this case, the election has already begun. Absentee voting started on September 5th. I recognize absentee voting by mail is not one of the provisions that's at issue here, but nevertheless, the election has already started. Mailings describing the rules and the procedures that are going to be followed have been sent out. Publicity in other forms has been made. To the voters? Yes, ma'am. Yes, Your Honor, to every voter and every household in North Carolina. How elaborate are those instructions? I'm sorry, Your Honor? How elaborate are those instructions? Is this a page or is this a book? It is a booklet, Your Honor. It's a booklet that describes not only the procedures. A 10-page booklet? I believe it is around 30 pages. To each voter? To each household in North Carolina. It's a combination booklet, Your Honor. It describes not only the rules and the procedures that are to be followed, the important dates with the election. It includes a form for voter registration. It includes a form for requesting an absentee ballot, and the other thing it does is include short biographies of every appellate judicial candidate in North Carolina. That all sounds wonderful. What of that would necessarily have to be changed? I'm sorry, Your Honor? If we should reverse the district court, what would have to be changed with respect to this booklet? It would mean that the information in the booklet is no longer accurate. Well, it sounded like the biographies of the people that are running for judge would stay the same. Of course. So it sounded like a lot of the things you were talking about were going to stay the same. Of course they would, Your Honor. But, for example, the date that early voting is going to start would no longer be correct because that date would change under... Let me make sure I understand. It seems to me the information would have to be changed, but it would be additional information. Nothing in the book would change insofar as, for instance, early voting, which is only 10 days. If it moves to 17, it just gives them more days, not less. It would be quite a different circumstance if we were saying, well, we've got to adjourn to 10. You can only do five. Then, at least in that instance, that would seem not to quite follow. There may be another. Let me see. I'm not sure it's quite that simple, Your Honor, and I don't want to give the idea that that booklet that has gone out to every household is the only way that it's being publicized how the election is going to be run. County boards of elections are publicizing where the satellite sites, those counties that will have them, not all counties do, are already publicizing where those satellite sites are. If, for example, the court were to order that early voting must begin seven days earlier than currently required by law, it is true that the only thing that would have to happen under the previous law is that the county board of elections office would have to offer early voting during business hours on that Thursday, Friday, then Monday, Tuesday, Wednesday. But it's also true that the county board of elections is going to have to have personnel to handle that because the people working in the county board of elections... We've sashayed into another area. We're still talking about the pamphlet and what changes would have to be made to the pamphlet. It doesn't seem to me... I thought you were telling me that you were going to have to redo the pamphlet. Oh, no, Your Honor, there's no question that the pamphlet could not be redone and sent out to the voters at this stage. The point would be that the information that the state will have given the voters about how the election will be run, about the need to go to your own precinct, about the registration deadlines, will no longer be accurate. Voters will have been given inaccurate information. The state wouldn't propose to send out new information? Your Honor, the state does not have the budget to do that. This is budgeted funds. And the state board of elections... Well, a lot of times, the federal court orders states to do things that they certainly did not have the budget to do before. That's certainly true, Your Honor, but there's also probably not time. Yes. I'm aware that can happen, Your Honor, but there's not time. There's not... Let me ask, and I think you're making a fair point in terms of what has to be done. To what extent do we consider at least the whole procedural way in which this happened? I mean, we've got a situation in which, go back to the history of how this building went through the House, within one day of the... Well, I guess it was the next day after the Shelby decision, you get a bill put on the floor. That's a full bill. There's nothing like... Well, not very much like the previous bill. And you move that through very quickly. You then go through the whole aspect of when the governor then actually signs it. From the plaintiff's perspective, they moved as quick as I think you can move pretty much like the next day or something. It might have been the same day to file the suit. So they moved as quick as they could, but the timing of when this bill went through is really something that happened in terms of the state of North Carolina. And so if it happens that even in expediting this matter, this is a matter that just came to us within a couple of weeks ago or so, and we move as quick as we can, so you put the court in a position where, well, we're going to delay this thing and kind of do it, count it in, and then not give you time to fix it if there's a disparate impact or if there's some type of vote of denial, if we can find that, if we find that to be the standard. I'm just saying we have. I'm just saying if we do. If there is that, well, we're going to say, well, you just don't have time to do it because we can't fix these books, and we've sent out these books, and we knew when we sent out those books you had this court thing going on. Think about it. I'm just trying to approach it from a perspective of I want to go with you on your argument, but I cannot look at it in a vacuum. And should we? Should we just ignore the reality here and take it just, which, you know, I guess judges, that's kind of what we can do. Just look at black-level law and forget how it really, really happened. But there's more to it than just there's not enough time. That's really where I'm going. How do you respond? I think the answer, Your Honor, is it's not a matter simply of not having time to redo the booklets. It's a question of what voters expect and understand the law to be, understand the procedures and requirements to be, and it's a matter of changing that in the weeks before the election. And my question, I guess, and I do want you to answer that, is to what extent do we have to accept that, well, the state of North Carolina didn't even think about this when they pushed this thing through and knowing the timing, knowing that these are likely things that can happen, and yet when it gets there, it's saying, well, we just can't do anything about it. It's too close. And yet, one day, I mean, the Shelby County decision to come down and deal with Section 5, because I think it's pretty clear, unless you tell me something wrong, what's before us now, Section 5 wouldn't have allowed in many aspects. Section 5 goes away. Next day, put a bill out that has much more in it than the bill that's already been debated, that's already on the floor. Then you move forward. Then it goes through the court system, and I don't think you can say that delay has happened from the court system. Judge Schroeder wrote a very long opinion, but it took a long time to do it, in terms of doing it, but he went as quickly as he could, and to us, as quickly as he can. If there's some delay in terms of why the voters have been putting this position, it's not the courts. It's not the plaintiffs. It's really the state of North Carolina that did this in terms of putting this in this posture at this particular time. I would say it's the plaintiffs' responsibility for doing that. Judge Schroeder heard evidence about the process by which the bill was enacted. That evidence that he heard was that while, yes, it came in the day after Shelby County came down, or it was brought to the committee that day, and moved quickly after that, the evidence that he heard was that was not unusual in legislative practice for bills of this type or for high-profile bills. The testimony he heard was that that was par for the course for the way these bills work a lot of times. You're correct. I understand policy has to do. I understand that there's a reason why the initial legislation came back in early 2000. Why is it here? Those are policy considerations. That clearly belongs to the state and how you go about doing it. I'm not challenging or at least asking you about that aspect or even saying it wasn't something you couldn't do. But in doing it, how do we not consider the fact that now, today, if there is something here in terms of the potentiality of a disparity impact being called for an injunction, that we have to say, no, you just don't have time to fix it. Your Honor, I think there are two or three things that you would look at there. The first is, as the Court has already noted, the primary went forward under the law that the plaintiffs are challenging. I'm sorry, Your Honor? There's no question that they're very different, but you probably wouldn't have changed this law if you just had primaries. But there is no question that the primary happened. The testimony, the plaintiffs talk about people becoming habituated to a new process or to the way things are done in an election. The testimony at the hearing of Gary Bartlett, who for 20-some years was Executive Director of the State's two or three elections, and by that he meant primaries and general elections for people to become used to the way things are done now. The plaintiffs allowed it to go forward. It is true that How did that testimony help you? Because there have been more than two or three elections, so that the voter got acclimated to the old system, but there haven't been two or three to get acclimated to the new system. Because the status quo of this case is that the law that the plaintiffs are challenging has gone forward and has been applied. The status quo How did this testimony that takes two or three elections to do that help you? Because, Your Honor, if it's two or three, we're halfway there on that application. They're all the way there. Well, but the point of that is that while primaries have a different dynamic from a general election, the testimony of the former executive director was that what happens in a primary is part of what informs the public about how elections work. And the election, the primary in 2014 went forward under the new law. It is true that the scheduling order that Judge Peek entered provided for preliminary injunction motions to be due by May. But it is also true, as the court has noted, that this case was filed immediately after these bills becoming law. What does that say in terms of the status quo? If the case is filed at the time that the governor signs it, which is pretty close, either the day of or the day after, what's the status quo on that day? The status quo is that the new law has become effective. At that point, it has not actually been enforced. So everything the voters in North Carolina are used to, as you say, the two or three elections, is what had just happened. And now what is sought here is to prohibit or to keep this from happening in the November election. Right? Correct, Your Honor. But in the meantime, we have an election. A primary election. I think we understand that point. Maybe you can move to it. Do you have any burdens that the state's going to suffer besides correcting the pamphlets? No, Your Honor. Yes, Your Honor. Voter confusion. That is what the Supreme Court has said is the very real risk here of changing the rules this close to an election. And did you have some testimony about that? Your Honor, the Supreme Court has said that is what happens when courts change the rules this close to an election. So there wasn't any particular testimony about it in this record? Your Honor, I cannot recall at this point that there was any specific testimony that were the laws, an injunction to be entered 40 days before the general election, 28 days before one-stop voting is set to begin, and 21 days before the plaintiffs would like for it to begin. I don't recall any specific testimony that doing so would create voter confusion. Would you recall any general testimony about voter confusion? Yes, Your Honor. I believe there was testimony that changing the rules late in the game can create voter confusion. I believe Sherry Poucher testified to that, and I believe that Michael Dickerson may have as well, the elections director of Mecklenburg County. I know it's not part of the record that was in front of Judge Schroeder, but the declaration filed by Ms. Strack in response to the motion to expedite or motion for state pending appeal, I forget which, goes into it in great detail, because the reality is But of course the district court couldn't have relied Of course, Your Honor, the district court could not have relied on that, but the reality is in July, while we were waiting for a decision, the State Board of Elections and County Boards of Elections were required to begin preparing for the election. Once Judge Schroeder's decision came down, saying there would be no preliminary injunction, County Boards of Elections, State Boards of Elections moved forward. What I'm trying to do to tease out of you is so far we have the pamphlets and we have some testimony about voter confusion. Do we have testimony, do we have other evidence of the burden on the state? With regard to if an injunction is issued. Your Honor, I think the primary thing we have is the obvious conclusion that the United States Supreme Court has reached, that when courts change the rules late in the game, before an election, and especially as was the case in Persil, where they say there are conflicting decisions and we do know that, and I won't belabor it. If you don't have anything more, if you've said everything you can say about this, you can go on to your next court. I just want to be sure I understood every interest that the state was putting forward here. So this is your opportunity. Thank you. Let me ask you regarding the confusion because I got a little confused. I thought you said you were referring to voter confusion and then it seemed to be as you were, and maybe it is the same, that you were talking about the County Board of Elections confusion. So is that the same kind of confusion we're talking about here because it's one thing to be confused in terms of which days by the board. It seems like, yeah, there's going to be some confusion. You've got a hundred boards out there working. I can see that. But are we talking about that or are we talking about voter confusion? Your Honor, I was primarily talking about voter confusion, but I think that is a point well taken. The reality is, if the court were to enter an injunction, then it's the County Boards of Elections that are going to have to implement that. It's the County Boards of Elections that are going to have to retrain their poll workers. And is that true with regard to every one of these provisions? I see it as the early voting. As to things like same-day registration, it seems like to me it's more informational. I mean, either you get it or you don't on that. Early registration, yeah, you've got to bring some new folks in. You can't just do that. Something has to happen. And maybe even with the out-of-precinct voting aspect of it, some of it comes in, but even that, out-of-precinct voting, and correct me if I'm wrong on it, maybe I couldn't quite understand that, it seems to me what that says is we're not talking about folks who aren't registered. We're talking about people who are just voting in a different precinct. Correct. And I know that goes more toward the fraud aspect of it, but I'm thinking in terms of the so-called confusion that you're saying arises from that, if that's true. Correct. With out-of-precinct we're talking about people who are registered who show up at the wrong precinct. The evidence that... What's going to happen, you know, and I was thinking about that, and I know, which I stick with the record here, but I don't happen to be living in North Carolina. You know, you can live in a neighborhood that has a precinct right next door to you. Do you know you cannot vote in that precinct? You have to go a couple of miles down to your precinct, which is kind of my situation, and I'm just thinking a number of folks who will walk into that precinct, that's right, it's like when I talk about the school system, and we know how the school system works like that too. But how... It looks like to me that that would lessen confusion for voters if I could walk into that precinct and vote as opposed to having to go a mile down the road to the precinct, which I know I'm supposed to. And for the life of me, I don't understand, you know, but that doesn't matter to me. I didn't mind taking an extra try. But... The confusion, Your Honor, is not over a specific voter knowing what precinct to go to. The confusion I am referring to is not over that. I will point out that the evidence that Judge Schroeder heard described that the reason this happens frequently is because of those organizing Get Out the Vote efforts who just take people to whatever precinct is convenient for them rather than trying to find out what precinct is the appropriate precinct for a person. And the problem with that is... I'm sorry, Your Honor? The problem with taking people to a place to vote when the law allows them to do it would be... The evidence before Judge Schroeder on that, Your Honor, was that the problem with that is it creates uncertainty on the part of county boards of elections. Because they know how many people are registered in their precincts. So they know how to plan for an election day. If a bus shows up with 60 people on it who are not in that precinct, they're now going to have to process without a precinct provisional ballots... Is that really going to be true in this election when I'm thinking about it? I go to my... I hate to keep using my situation, but I do live in this state. I've never seen a whole bunch of people at that polling place except maybe during the presidential election. There might be a bunch. But for the most part, it looks like to me, out of all the thousands that could be voting, I want to win all the people today. And so if a few extra come in, does it show, at least statistically, that you have that as a sincere problem? I understand it could be. I'm saying in certain situations that could be the situation. Of course, this election is not that type of election. I know you don't expect these polls to be bubbling over. At the end of the precinct, maybe some, maybe some, unless there's something really hot there. Is that really a concern? Well, Your Honor, I think we're switching around what the question here is. The question is for a preliminary injunction, not whether or not that is a significant concern for this election. That may be a valid question for whether or not the legislature had a valid reason for enacting the law applicable to all elections. The question for this election, the question for this preliminary injunction is have the plaintiffs shown a likelihood of irreparable harm if the injunction is not... I agree with you. That is the issue. But what we were discussing had to do with the specific aspects of confusion on this election. That's kind of why I went there. It's fair. That is the issue in this case. Right, Your Honor. Again, with regard to two of the four provisions at issue, the early voting, as people typically call it, and the pre-registration, the judge based his ruling, Judge Schroeder based his ruling not on likelihood of success on the merits, but on the fact that the plaintiffs had not offered clear evidence of likelihood of harm. Those findings are binding on the court unless... You're not relying on the last two elements at all, which I would have thought states usually do. The last two elements of likelihood... Preliminary injunction, the four factors, are you familiar with those? Yes, Your Honor.  Your Honor... You know what they are. Yes, Your Honor. Your Honor, we think it is very clear, as we have argued from the outset to Judge Schroeder and here, that the harm to the public in a case like this comes from certainty and comes from changing the rules of an election at the last minute. And that's the harm that the public feels, and when the equities are balanced in that regard, that has to outweigh any harm that the plaintiffs may have put forward. But the bottom line is, for what we are here for today, Judge Schroeder found that as to early voting and as to preregistration, the plaintiffs had not shown likelihood of harm. That at most they had shown speculation of possible harm. They had not shown harm. Those are his factual findings. I have not heard the plaintiffs yet challenge those findings. Other than to say, well, yes, there will be harm. But they have not shown how Judge Schroeder misinterpreted the record. I think we understand your position there. What I was asking you is if you were making an additional argument. Usually lawyers, they have five arguments, want to make all five. They just don't want to rest on the first one or the second one. And whether you were going to also argue that the balance of equity is in your favor and that no injunction is in the public interest. For example, if we order that the court reinstate the North Carolina prior election law, what does the state have to do? The state will have to reeducate the voters as to what the new requirements are. Well, I'm going to send out a new pamphlet. You've already told me that. No, Your Honor, because it's too late to do that. So the state and county boards of elections will have to let the voters know what the new rules are with the election already underway. Well, actually, if we do what Judge Mott suggested, we're actually restoring the SDR out of precinct. Even if they follow your new rules or by accident want to follow the old rules, where's the harm to you? The harm, Your Honor, comes from the fact that not only the voter confusion, having to let voters know what the new rules are, but county boards of elections and the state board are now going to have to implement the election under procedures they were not prepared to do, they did not do in May, that are not in place. The plaintiffs, for example, say, well, it's just a matter of flipping a switch for same-day registration to put the application back into the statewide system to allow that to work. That might have been the case when Mr. Burris gave his deposition in April. It is not the case now. An administrative burden trump a constitutional right? Your Honor, the administrative burden and the right of the people to an orderly election does trump the claims that the plaintiffs have when they have not shown a likelihood of any harm resulting from enforcement of the new laws. I understand your argument about orderly elections, but how about those people that are deprived of the right to vote? Your Honor, I think we have to bear in mind that it's not just a matter of whether somebody goes in and is not able to vote. While we regret it when anybody is not able to vote, obviously we want everybody to vote. We want everybody to vote in every election. But the issue is not just whether somebody is unable to vote. The issue is whether they are unable to vote. And the reason they are unable to vote is because they did not have an equal opportunity to other voters. Equal opportunity available to them to vote or to register to vote. And with all four of these provisions that are at issue, Judge Schroeder found with regard to early voting, with regard to the same day registration, and with regard to out-of-precinct provisional balloting, Judge Schroeder found as fact that there were other means available to people that placed them on an equal basis so that there was not an unequal denying of votes. Your Honor, finally, I would simply say we believe that not only is issuing an injunction and overturning Judge Schroeder wrong, but as the Supreme Court has noted, it could create a great deal of confusion should the Court be inclined to issue an injunction. We do ask the Court to enter a stay of that order pending appeal to the Supreme Court. If we need to file a paper motion to that effect, we'll be glad to tomorrow. Can I ask you one last question? Certainly. Do you believe that the District Court erred in some of its legal analysis? Does that require reversal here? Not necessarily, Your Honor. One of your colleagues mentioned in her opening argument that as a general rule, every error of law constitutes an abuse of discretion. The standard here is abuse of discretion. Why not? Because at least as to two of the four provisions in that issue, Judge Schroeder did it based on his findings of the evidence, not on the basis of an error of law. His finding of the evidence. The plaintiffs have not challenged his findings. They have not challenged or shown how the record does not support his findings. Of course, the standard of review is a very high one. As the Sixth Circuit said yesterday, it's not a matter of substituting a view of the evidence for someone else. Thank you. Before you leave, I did want one question. One at least. You focused on the harm element, and I'm reading that as your statement, not that you've given up on the rest, but that's your strongest argument. Is that where you've gone with this? Your strongest argument deals with the irreparable harm element of the preliminary injunction, and that's why you focused on it to that degree. Your Honor, I focused on it because that was how Mr. Farr and I split the arguments, that I would focus on irreparable harm. He would focus on likelihood of success. Your Honors, if that may please the Court, my name is Tom Farr. I'm with the Republicans. Mr. Farr, you be sure to speak into that microphone. Yes, ma'am. I did want to talk about a couple of points that were made or were discussed by the Court and Mr. Peters. Judge Wynn and Judge Motsch, you made the point that primary elections are different than general elections, and that's true, but we had a prediction of all sorts of horrible things were going to happen because of the changes that had been made, and so it is worth something to compare what happened in the 2010 turnout. What kind of predictions did you get of the horrible things that were going to happen? Well, Judge Wynn, this case has been described as a voter suppression case from day one. There's a story about it in the WRAL today, and so this is the description of the case, Your Honor, despite the fact... And I don't want to get you off on any of the points that you need to make here today. I think you initially brought out, and I think just trying to be fair in terms of looking at how do we view the primary election when we look at the type of law here, policy side in terms of how it came about is not really something we're going to deal with. Yes, sir. I'm going to challenge the policy aspect of it. You certainly have a right to do it. The state of North Carolina can set their voter laws, but when we're looking at something like a primary where it's primarily a partisan type situation, the kind of concerns here when you... I think it's pretty evident that when you're looking at minority voters, you're primarily looking at one party, and so the suppression within that party, well, is relevant, but the kind of concerns that are being brought here, aren't they different? I mean, for what? The election is coming up? And then given with the schedule and the order from the plaintiffs, how could they... I don't know how they could have moved it. Judge Wynne, I absolutely agree with you, but for example, at the trial of this case, we had an expert witness who gave testimony about how long the lines were going to be in North Carolina based upon 200 people that answered an internet survey. In the May primary, we had over a million people vote, and this case has been described as a huge voter suppression case, even though it's not well understood or discussed in the general media, that the practices that North Carolina has adopted represent the majority rule in a majority of the states. Well, I think we've gotten off on the primary. Maybe you can... Because you don't... You've got 20 minutes. I do, Your Honor, but I just... Let's talk about it. I just wanted to point out, Your Honor, that you made the point that it's worth something that the turnout was higher by minorities in the primary in 2014 than it was in 2010. And if this law was going to have all these horrible effects in voter suppression, one would have thought that there would have been at least some evidence of a suppression of the vote in the primary. I agree the primary is different than the general election. That's my only point, Your Honor. But it's also relevant in considering what would we look at as a status quo, right? And that's where you're going, too, also, in terms of how you... Because I take it you say the status quo law. That sure is, Your Honor, because that's what is happening. That's the system that's being implemented by the state of North Carolina. But where I have some difficulty, at least, and you answer this, because maybe the law is different on it. It would seem to me that none of that was in place when the lawsuit was filed. The lawsuit was filed after the governor signed it. What's the status quo then? The status quo was the past practice that had not been changed in an election. But, Your Honor, quite frankly, I would argue the status quo changed as soon as the new law was enacted. And the plaintiffs elected not to move for a preliminary injunction of the May primary. And so we did conduct an election, and we have voters who now have voted under these new practices. We have election officials who have conducted elections under these new practices. And I would submit that that's the status quo. That's what's happening in North Carolina right now. That's what happened in the last election. That's what's happening right now. So they are asking you to issue a mandatory injunction to change the system that's in place at the present time. And they elected not to challenge that prior to the May primary. But it is a choice of words to some extent. I mean, when the lawsuit was filed, and then ultimately the action has taken it to at least to enjoin it, the intent at that time is to prohibit the implementation of these new laws to the exclusion of what has been going on for years. That just seems to sort of flow. I understand that you could change it, but it seems like to me that status quo business that you can flip it pretty quickly. As you say, it happens soon as the law passes, you change the status quo because that's what the General Assembly has done. Your Honor, again, this is all a question of semantics, as you point out. But if court is to manage, because what you call this injunction, it really changes it whether it's mandatory or prohibitive, correct? That's true, and we have one position on that, and the court will decide its position on it, and you understand our argument on it. Yeah, I think we do understand your argument. Do you have anything to offer with respect to whether if we should issue an injunction there would be a burden on the state? Yes, Your Honor, I do. I'm not sure if Mr. I wasn't quite sure if Mr. Peters got into this, Your Honor, but the election officials in North Carolina had never conducted same-day registration by hand. And when you go into a same-day registration, that site has to have all of the ballots within that county. And the way it worked previously was it was automated, and the voter's information was put into a computer, and then the ballot was printed for that particular voter. The system that would do that has been disabled, and I believe Ms. Strack, the Executive Director, has explained why it would be extremely difficult to re-enable that particular application because it works with all sorts of other applications within the state. It's possible that it's likely, in fact, that if you re-engage the same-day registration automated application, there's no telling what sort of errors or problems it would cause with other applications that are part of the SEAMS process, such as, Your Honor, when you register to vote, the process, the application automatically kicks out a letter to the employee, to the person who's registered to try to verify whether or not the information is accurate. Let's assume that you're correct on that, and that you would then have to have these hands, you'd have to do this by hand rather than automated. Is there anything else you want to add to that? Well, I would say, Your Honor, the parties, it's not just the state of North Carolina, it's the political parties and the candidates who are campaigning, investing resources, explaining to their supporters how the election's going to work this year. So they're telling their supporters when early voting's going to start. They're telling their supporters that they have to register 25 days before the election. They're telling their supporters they have to vote in their assigned precincts. Of course, this will be an equal opportunity burden on both parties. Yes, Your Honor, that's true. Yes, there's other provisions of state law. But I would say, Your Honor, with the Supreme Court has been very reluctant to issue injunctions similar to what the plaintiffs are seeking here this close to an election because of the potential harm to the election process. I don't believe there is a Supreme Court case where a similar type of injunction that the plaintiffs are seeking here was issued, what is it, 30 days before early voting is supposed to start? Don't hold me to that, Your Honor, because I don't know for sure, but I know we're coming up on early voting very soon and we're only 40 or so days from the election, and I don't think that you'll find a case where a Supreme Court reversed a district court judge who evaluated the evidence and there's thousands of pages that he looked at. Well, what should we do if we believe the district court applied an incorrect legal standard at least in this case? Well, Your Honor, I know that, I hope you don't conclude that he applied the incorrect legal standard, and I'd like to talk about that. Thank you, Your Honor. Thank you very much. But, I do know that there's several cases that we've cited to the court where the Supreme Court has allowed elections to go forward under illegal redistricting plans, and we've cited those cases to you, and the reason why the court has allowed the elections to go forward is because once you get to this point in the election cycle, the public interest, I think that's the fourth criteria, Your Honor, the public interest is not served by changing the rules for an election this close to an election. Help me out with the timeline. Do you know off the top of your head the date that Sheldon was decided, do you know the date the governor signed the legislation and the date of the primary? The date of the primary was May 14th, I think.  The legislation was passed in 2013, Your Honor, and that's about the best I can do. I think it was... Two or three days after Sheldon. I don't believe it was two or three days after Sheldon, Your Honor. I think it was, you know, it wasn't an extended period of time. It seems like the next day after Sheldon. I don't think it was the next day after Shelby, Your Honor. I would just... Judge Schroeder goes into that in great detail in his factual history, and I would just have to rely on... There's one question I want to go back to, just to the burden aspect. When you talk about out-of-precinct-type voting, Mr. Peters alluded to this instance of a busload of folks being dropped off at the wrong precinct, and the burden it would be on that precinct to handle it. Does the new law... If that happens, a busload of people is dropped off at the wrong precinct, don't they still have to let them vote provisionally? Is that true? I think they do, Your Honor, but their votes won't be counted. But what they do tell them... Provisional votes ultimately might be  So they vote provisionally, and then the state administratively has to go through the determination that they're in the wrong county... Wrong precinct. I'm sorry, wrong precinct. And I'm just trying to follow that through. But the provisional vote is not like absentee vote, where ultimately it will be counted but later on. You're saying the provisional vote is one in which the determination is going to be, were you in the right precinct? If you weren't, it's not going to be counted. That's right. But Your Honor, I want... I think, Judge Wynne, the ultimate question is with all this burden that you've been talking about dealing with these votes, you'd still have to under your system, and you could say they're provisionally voting, you'd still have to go through that burden, wouldn't you? Well, you wouldn't have to count. And you'd have to have extra people to actually count, and you'd have to do a hand count on the ballots to do that. But... Just to let people... Why does the state of North Carolina doesn't want people to vote? That's what's really bothering me. The out-of-precinct voting, as the example I gave, it is true. From where I live, I'm telling you, the precinct that's next to me, I could walk to, but I've got to drive down to another one. And it would be just... I'm thinking of the statistics given on poverty, education level, transportation, the elderly. In this state, there are people who, just like the school issues that have come up, where there's a school next door and your kid's being bused down the road. Voting's a little different. And there, what's the problem? And you know what really bothers me? It really bothers me. We're in 2014. And there's technology everywhere. You don't require this stuff of me to file taxes and all this other stuff when things are going on, and yet, you just want to cast a vote. What's wrong with that? I'm trying to understand what's wrong with voting in a precinct in your county when that information is pretty readily... And it's worked. It's been working for years. What's the burden, I guess, is where you're concerned? The burden that's put on by saying, do what you've been doing for years. Let grandma go and vote in that precinct that she's been walking to out of precinct, or when someone drops her off, whether on a bus, whether it's a highway. In my old days, it was a mule and a cart, but we don't do that anymore. However, let her just vote in that precinct and that's pretty easy. We've got a little computer here. When you find out she's fine. Okay. No, that's not the way it works, Your Honor. They don't have a little computer and say that it's fine. But it did work. Even in terms of the amount of fraud that would come out of that, it wouldn't really be fraud for most folks, because they actually are registered. Well, Your Honor, this raises a good point, and the point is, that's a great argument that you just made. Oh, I'm not making you an argument. I'm just asking you. You make the argument. If I act like I'm making an argument here, then don't do that. No. I want you to give the argument. I'm sort of inviting you to help me with it. I'm throwing the other side out and saying, okay, judge, you're just wrong on this. This is the way it is. Okay. Well, let me say it's a good policy argument that you made. But the argument that you made, Your Honor, if you're correct, and if this court can dictate to North Carolina that they have to count out-of-precinct ballots... No, I'm talking about the burden it would be for preliminary injunctional. The burden if, in fact, we said, yes, that's enjoined, you must do what that so-called burden you're saying is going to happen as a result of having to now implement it. It seems like one burden is taken off. You don't have those provisional ballots that you're now going to have to administrate or deal with when that busload of folks show up and you've got all those ballots up there to deal with. That's gone. And so there might be, as I understand, a great deal of effort to put it back the way it was because you've now thrown that away, but you didn't say it couldn't be done. What I think I heard was it would be very difficult. Right. But my question is, can it be done? I think that it's probably more likely that that could be done than same-day registration, but it still would be burdensome because... But that burdensome would result in a lot of folks being able to vote who otherwise would be putting in provisional ballots that you tell me, they're not going to be counted. Those are going to be thrown away. Your Honor, that's an assumption but for which there's no evidence. You are looking at a statistical correlation. An assumption that someone who walks into the wrong precinct and votes that his vote won't count? That's not an assumption. You told me that's a reality. Why did they go to that wrong precinct? It could have been Grandma's right there next door, but she walked over to the precinct. Again, I don't want to give the answers to this, and you're right. There's no evidence Grandma's going to do that. But we do have to use a little common sense here. We know this happens. And we do know that... I'm sorry, Your Honor. From past practices, there's evidence within the record that goes to the level of education disparity, the transportation disparity that exists for certain people, the moving around. There is confusion. A lot of folks, if you'd ask them what precinct they're voting, I bet you they probably couldn't tell you sitting in this place right now. You've got to really think about sometimes what precinct you are supposed to vote in. And you're in the same county. And... I don't know. I'm having some hard times getting around on that one. It just seems like I'm not paying precinct taxes. I pay county taxes. I pay the whole bit. And why have I got to put through this confusion of saying, you don't vote right there on 3rd Street in that little church right there. Your vote doesn't count. All right, Your Honor. Then in Washington, I'm going to be in Greensboro. I actually am going to be in Mecklenburg County. We're going to keep it in the county. We keep it in the county. We keep it on the same street. Why would you keep it in the county? What if somebody moves a lot and hasn't been able to re-register and he's moved to Mecklenburg County? He could go do the same thing in Mecklenburg County and vote for statewide offices. That's certainly not fair. So where do you cut this off? Well, shouldn't that be cut off? I mean, is that wrong? You said statewide. He didn't say he was going to vote in the county elections. He said just the statewide elections. He can vote for the governor in my county and Martin County. He's a citizen of the state of North Carolina. It's a reasonable regulation on the time, place and manner of holding elections which is followed by a majority of the states in the United States. Your Honor, if you believe that the court... If you spoke to the majority of the states and how things are done, again, it goes to what we consider status quo. If you enact a law and the law results in a great deal of people voting, then you enact another law and it takes it away. I mean, we don't look to see how Mississippi or Wisconsin does stuff in North Carolina when you do that. We look to see how have you created a disparate impact in that cycle. But, Your Honor, that's the whole point. Yes. There is no evidence that these practices have a statistically significant relationship to black turnout or black registration. And there was a test, a commonly accepted test, that the United States expert said could have been done where they would compare states like South Carolina. What you're saying right now, Your Honor, is if the court would order North Carolina to count out of precinct ballots, you have the same history of discrimination, unfortunately, and you have the same socioeconomic conditions in South Carolina. So you're saying that it would be okay for a plaintiff to sue in South Carolina and try to get South Carolina to order out of precinct ballots. We're not at the trial. We're not at the trial. We're putting our injunction, so I'm only... The only thing I'm dealing with... I think there is a question in terms of what the status quo, but either way, we're looking at it. The reason I'm putting it in this vein, we're talking North Carolina. North Carolina has done it this way. And the question is, should it be required to continue this way until you have this trial because there has been some indication that at least maybe it did have. Your Honor, the plaintiffs have completely failed in their burden of proof in showing that these practices contributed to high registration or turnout. There's a correlation between disproportionate participation in the practices, but they did not do the test. They intentionally did not do the test to show whether or not you have to have these practices to provide African-Americans with equal opportunity to vote. And the reason... We had an expert that did it. But you don't accept that past practices should be considered in Section 2 type. No, Your Honor. With all due respect, I would interpret... Due respect to the Sixth Circuit or due respect to... Due respect to you to whom I have... I can make this law. I'm trying to figure out, if you ask me due respect, who are you giving that due respect to? Well, I hope I'm giving it to you, Your Honor, because I have a great deal of respect for you. You and I are going to have respect. We have a legal argument, but when I said that, I mean all due respect to the state of the law of how it is characterized. So I'm looking at how the Sixth Circuit did and others did it. So in that vein, that's where... I have a minute and a half, and I'm just getting to... This is a well-spent minute. You have it right now. Okay. So here's the difference, Your Honor. In a Section 5 case, you look at the past practices to see if the change will make the minority group worse off. In Section 2, you look at the practices that exist, and do the practices that exist create an unequal opportunity? So voter denial is not a part of Section 2, is what you're saying. Voter denial is not a part of Section 2. It's voter delusion from your perspective. No, sir. What I'm saying is that the statute and the cases say there has to be a causal connection between the voting practices and discriminatory results. This is why you have the Jingles preconditions in vote delusion cases, because the Jingles preconditions prove discriminatory results through statistical evidence, racially polarized voting. The plaintiffs have offered no proof that the practices that were repealed will result in vote suppression or decline in voter turnout or registration, and they have no proof that the practices that are in place won't result in increased registration and increased participation. In fact, their experts admitted that was possible. And their experts... So before you sit, I want to make sure, because you mentioned causation, and you articulate your position on causation, I want to make sure the other side, whether or not there's agreement in terms of how you characterize a causation that you just postulated in what they said. Well... I'm going to guess that my good friends, and they are good friends, are going to disagree with me on the issue of causation. But, Your Honor, in our view, Jingles is very clear that there has to be a causal link between the practices in a voting procedure that creates unequal opportunity. How can there be unequal opportunity when all voters have the right to register 25 days before the election, all have the right to vote during the 10-day early period, all have the right to do 60-day absentee write-in ballot. The statute itself is facially neutral, unlike a redistricting plan, which creates districts where African Americans cannot elect a candidate of choice. And they declined to do the test that they could have done, which is similar to the regression analysis in a vote deletion case, where they could have put at least some evidence in the record of a statistically significant relationship between the practices that were implemented by African Americans. Thank you, Your Honor. I think my time's up. Thank you. Thank you very much. Thank you, Your Honors. I want to start where Mr. Farr ended with the test that he suggests that our experts did not perform. And I just wanted to point out that the district court did find that the practices that are being repealed, particularly same-day registration and out-of-precinct voting, do have a disparate impact on African Americans. And as the district court said, they are more heavily on African Americans. What is your view? Do you agree with his view on causation? Your Honor, our view on causation is that the question No, I do not agree with Mr. Farr. Our view on causation is that, and this has been said in several cases, including the recent Sixth Circuit case, but also the case under the Ninth Circuit, the causation requirement is to show that the social and economic conditions of African Americans is related to the practice that is being challenged. And here, the practice that is being challenged is the repeal of these provisions and the cutback in early voting. And the district court's own findings were that there were social and economic disadvantages that made, that impacted the ability of African Americans to vote without those conditions. I also want to just talk briefly about out-of-precinct voting. I think Your Honor explained very clearly the reason that this happens sometimes, and the record is full of witnesses who testified as to actually seeing voters who accidentally came to the wrong precinct. It's easy to get mixed up. There have been a lot of precincts that have been split in the state as a result of redistricting. And... ...practices should not, as I understand, the Section 5 type dealing with, not necessarily retrogressing, but the past history. As I understand, it seems like the district court may have gone there. It's something that's not a part of Section 2. Do you agree? Absolutely not. And the Jingles case and the Senate report specifically say that there should be a probing examination of past and present reality. And the past definitely impacts the present, and that's what's happened here with the social and economic conditions of African Americans today in the state impacting their ability to vote because of the past history of discrimination. And I do want to say that if this court does not enter an injunction preserving the status quo as it existed prior to the filing of this lawsuit, there will be actual voters who will come to the polls in November and they will either be turned away because they cannot do same-day registration. That didn't happen in the primary. The primers didn't have that problem at all? If you look at the amicus brief from the Brennan Center, they cite a report, a recent report on the primary, and they give actual voter stories of voters who came to the... One is an African American couple. They moved to a new county. They didn't know they had to re-register. They came to early voting under the prior system. They would have been able to do same-day registration. They were turned away. It's in the report. It's cited in the Brennan Center. And another one out of precinct, a disabled senior African American was driven to a polling place by a neighbor, accidentally went to the wrong polling place, cast a provisional ballot. The state is required to offer that provisional ballot, but as Mr. Farr said, they're just going to throw it out. And in that report... What would have happened if the senior had been driven to the wrong county? Well, in the... Under the prior law, if you accidentally cast a provisional ballot in the wrong precinct, it had to be in the right county for it to be counted. And it's only partially counted. It's not counted. So we're still going to have some people that go to the wrong precinct. There are 100 counties. That's true. That's true, Your Honor. But at this point, we are asking that the status quo be reinstated. And at least for within the same county where they have the records to be able to know where the ballot should have been counted or not, that it should be counted. Status quo, word semantics came up in terms of whether that should be or not, but that's pretty important. You say status quo is the way it used to be, and I understand from the when that new bill came out. And now there's been a primary. And now that's the status quo that we now operate with, not what you are referring to. Well, Your Honor, I would refer to the Paschby case, which is cited in the brief, and there a challenge practice was in effect for seven months. But this circuit held that it's the status prior to the controversy that you look at for the status quo. Can you explain to me why you didn't file a motion for preliminary injunction before the primary? Yes, Your Honor. We filed this case on the day that the governor signed the bill. I'm aware of that. That was in August. That wasn't the question I asked. Right. It took until I think late November or December before we were before the magistrate on a scheduling order. The magistrate told us that the soonest that we could get before the judge on a preliminary injunction is July of this year. And the primary was in May. But you lodged a motion for a preliminary injunction in May about two weeks after the primary had been held. And when I litigated cases, if you didn't like the deadline you got, you asked for a new one. Did you do that? No, we did not do that, Your Honor. Thank you. Thank you, Your Honor. I will try to cover some of what came up with respect to the burden of questions. No argument limited again to the 26th Amendment? No, Your Honor. Since they did not address the 26th Amendment, I'm not going to rebut something. Just like they did down below. They've been ignoring you the whole time. I pulled an inside straight on that, Your Honor. First, I think that the state significantly oversells the Purcell decision. The Supreme Court has never set out a decision that says that you can't have an injunction close to an election. What happened in Purcell was that the District Court was quite delayed in its handling of the matter. The Court of Appeals stepped in before the District Court had a chance to issue a written decision and findings of fact and issued an injunction. And what the Supreme Court actually was saying was that they assumed that the Court of Appeals had moved quickly because it was before an election, but that they had to give the District Court an opportunity to proceed first. It was not a blanket rule that there is somehow... Well, I take your point. I think that's something that can be said about Purcell. But doesn't that lead to the logical conclusion that if we should find fault with the District Court opinion, we would remand to the District Court? No, Your Honor, because there isn't enough... Because the District Court had its opportunity to hear this case and issue findings of fact, which is what's different than Purcell. The second, Your Honor, you asked a specific question about Wisconsin, and I wanted to address that. The confusion in Wisconsin that is currently reported that I think you were referring to is coming from two places. Number one, you have a new ID law that the local election officials have never dealt with before. Here, we're actually asking the election officials to deal with something they actually are familiar with from the past. The second, though, and probably more significant, is that the ID law in Wisconsin applies to absentee balloting as well, and the absentee ballots have already gone out. So you have categories of voters, people who have cast absentee ballots, who did so without ID and are now being told... When did the absentee ballots go out again? The absentee ballots have gone out, but there is nothing being challenged here that affects absentee balloting. Whereas in Wisconsin, one of the provisions being challenged dealt with absentee balloting, and that's much of the confusion. Number three, I would point, Your Honors, to the OFA v. Husted, Obama for America v. Husted decision, where the Sixth Circuit decision there to restore early vote was not issued until October 5th. So the Sixth Circuit restored early vote. So you've got all the time in the world to deal with the 26th Amendment and the rest of the claims before you. The third is, and I think, Your Honor, Judge Wynne, you asked a very important question. You slipped that 26th Amendment back in. I did, I did. I apologize. Your Honor, you asked a very important question. The Help America Vote Act, HAVA, requires every person who shows up at a polling place who's not on the polls to get a provisional ballot. By federal law, they have to get a provisional ballot. It is a scourge of the American election system, and there are states like Ohio where there are hundreds of thousands of provisional ballots from people who show up and get them and don't have their vote counted. And North Carolina has avoided that. The administrative burden of provisional ballot compared to counting, which is what we heard was the burden. The burden would be that the out-of- precinct ballots would have to be counted. Compared to the time the state of North Carolina will spend resolving provisional ballots that stack up and stack up and stack up, there is no question that allowing people to vote out-of-precinct saves states money, saves states time, enfranchises voters. There is no burden to provisional voting. And you can look at any state that has the rule one way or the other and come to the conclusion that there is no genuine burden that the state of North Carolina can fear. With respect to... You know, that more goes to the policy of whether to do it or not. The burden at this stage would be the question of what does it take to put it in place even if it's a good or bad thing. But Your Honor, it takes no burden to put it in place. It's simply... I'm not saying that, but I'm just saying what you just said, it goes more to the policy, the question of whether it saves them time or whatever. I think it goes more that than it does to the actual burden. The burden deals with now if you change it, what will you have to do and how will this be in effect, at least in North Carolina, maybe in terms of voter confusion too. Right. So with respect to voter confusion, there would be no voter confusion because, first of all, as we've now heard from several people, the turnout in the primary was relatively low versus the turnout in the general election in 2012. That doesn't prove anything either. I mean, they're always low. No, no, that's correct. My point though is that there's not an electorate that now has ingrained that these practices are no longer in place. Unless someone happens to be among the small number of primary voters or someone who read that booklet, they probably are more familiar with the old law than the new law. So I think there's not likely to be much voter confusion on that front. But furthermore, with respect to out-of-precinct voting and same-day registration, this is very important. I'll be quite brief. These are people who vote out-of-precinct or need same-day registration wind up there because the system has failed them in some way or they haven't fully complied with the rules. So the truth is there is no confusion because they didn't know they were in the wrong precinct. If they knew they were in the wrong precinct, they wouldn't have showed up. Your Honor, with that I will sit. Thank you. Thank you very much for your arguments. We would like to ask our clerk to adjourn court and then we will come down and brief the lawyers and thank them. There are fine arguments and fine briefs.
judges: Diana Gribbon Motz, James A. Wynn, Jr., Henry F. Floyd